# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 7, 2013 Session

## STATE OF TENNESSEE v. BRODERICK DEVONTE FAYNE

**Appeal from the Circuit Court for Tipton County**
**No. 7219      Joseph A. Walker, III, Judge**

_____

**No. W2012-01488-CCA-R3-CD  - Filed July 2, 2013**

_____

The defendant, Broderick Devonte Fayne, was convicted by a Tipton County jury of aggravated burglary and employing a firearm during the commission of a dangerous felony, both Class C felonies.  The trial court sentenced him as a Range I, standard offender to consecutive terms of three years at 30% for the aggravated burglary conviction and to six years at 100% for the employing a firearm during a dangerous felony conviction, for a total effective sentence of nine years in the Department of Correction.  In a timely appeal to this court, the defendant raises the following issues:  (1) whether the evidence is sufficient to sustain his conviction for employing a firearm during the commission of a dangerous felony; (2) whether the trial court erred by denying his motion for a mistrial following the prosecutor's introduction of his defense counsel as employees of the public defender's office; (3) whether the trial court properly allowed the defendant's accomplice to testify regarding his understanding of the charges against him; (4) whether his right to a fair trial was violated by the State's arguing alternate theories of his guilt; and (5) whether the trial court erred by denying his request for jury instructions defining possession and constructive possession. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Parker O. Dixon (on appeal and at trial) and Melissa Downing (at trial), Assistant Public Defenders, for the appellant, Broderick Devonte Fayne.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and Billy G. Burk, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On July 14, 2011, fourteen-year-old Kylan Spearmon was home alone in his mother's Covington house when he heard the back door bang loudly and saw two men enter. One of the two, whom he saw only as "a shadow," went into his bedroom. The second man, who was much taller and armed with a pistol, ordered Spearmon onto the floor, threatening to "shoot [his] brains out" if he did not comply. After a few minutes, the first man called out to his companion to go, and both men ran out the door. Following an investigation, the police developed the six-foot-four-inch tall defendant and his cousin, five-foot-nine-inch tall Rodnicholas Lewis, as suspects. Each man gave a statement to police admitting to the burglary but accusing his companion of having been the gunman, and both were subsequently indicted for aggravated burglary and employing a firearm during the commission of a dangerous felony. Lewis, however, later accepted a plea deal in which the firearm count was dismissed in exchange for his truthful testimony against the defendant.

At the defendant's May 8, 2012 trial, Spearmon's mother, Toi Spearman, testified that on the day of the burglary she went to work at 7:30 a.m. in the family's only vehicle, leaving her fourteen-year-old son home alone. She said that she did not know the defendant and did not give him permission to enter her home. She stated that Rodney Gude was her twenty-three-year-old nephew and that he frequently visited her home but did not live with her. To her knowledge, there were no guns or drugs in her home on the day of the burglary.

Kylan Spearmon testified that he was home alone watching television on July 14, 2011, when the doorbell rang. Because his mother had instructed him not to answer the door when he was home alone, he resumed watching television after looking out the window and not seeing anyone he recognized. Approximately thirty minutes later, he heard a "big thump" from the back and two men came into the house. He saw "a shadow" of one of the men entering his bedroom and was in the process of fleeing toward the front door when the second man, who was armed with a pistol, saw him and threatened to "shoot [his] brains out" if he did not stop moving and get down on the floor.

Spearmon testified that he was five feet, ten or eleven inches tall and that the gunman was much taller, dark-skinned, and wearing a toboggan on his head and a bandana over his face. He estimated that the men were in the house for ten to fifteen minutes, with the gunman pointing his gun at him while the first man searched the house, until the first one said, "Let's go," and both men ran out the door. Spearmon stated that, to his knowledge, there were no guns or drugs in the home. On cross-examination, he acknowledged that he did not mention the gunman's height until the police who responded to the scene began

-2-

asking him specific questions about it. He further acknowledged that at the time he gave his statement, he reported his own height as five feet, nine inches tall. He denied, however, that his having been sitting on the couch when the men entered the home would have altered his perception of the gunman's height. Finally, he acknowledged that he reported that the gunman was wearing a white tank top and a blue bandana over his face.

At the request of the prosecutor, the witness and the defendant stood to illustrate to the jury their "height differentials."

Sergeant Larry McGarity, a detective with the Covington Police Department, testified that he spoke with both the defendant and Rodnicholas Lewis after their names came up in his investigation as possible suspects. On July 26, 2011, the defendant came to the police department, where Sergeant McGarity advised him of his rights and conducted an interview in which the defendant admitted having burglarized the house with Lewis. The defendant's statement, which was admitted as an exhibit and published to the jury, reads as follows:

> Rodnicholas picked me up and told me that we could get some straps and or drugs. I agreed to go along with him. We went and parked the car at his aunt['s] house and walked around the house to Vondis['] crib. We went to the house and entered by kicking in the door and proceeded to rob the house. We left the house and ran back to his aunt's house fleeing the scene.

Sergeant McGarity testified that "straps" was street terminology for guns and that the defendant informed him that Lewis had a gun during the burglary but that he did not.

Twenty-year-old Rodnicholas Lewis testified that he had been charged with aggravated burglary and employing a firearm during the commission of a dangerous felony and had agreed to testify truthfully against the defendant in exchange for the dismissal of the firearm count of the indictment. He said that he had known the defendant, who was his cousin, his entire life and that he and the defendant were both members of a rap group called "Trap Money." He stated that Rodney Gude and his friends were members of a different rap group called "Long Money." On one occasion in the past, he had been to the Spearmon home with Gude, and he was aware that Gude sometimes stayed there. At the time of the burglary, however, he and his fellow Trap Money members had had a disagreement with Gude and his Long Money group.

Lewis testified that on July 11, 2012, a member of his Trap Money group, Lavondis Boyd, who lived near the Spearmon home, brought up the idea of kicking in the door of the Spearmon house as retaliation for what Gude and his Long Money group had done to the Trap Money group the previous week. Lewis said that Boyd convinced him and the

-3-

defendant to accompany him as he walked over to the Spearmon home and rang the doorbell. After three or four minutes, Boyd announced that nobody was at home. Lewis claimed that, at that point, he got cold feet and told the defendant that he did not want to do anything. Nonetheless, he followed behind as the defendant walked into the Spearmon yard, pulled a gun out of his shorts, kicked in the door of the home, and entered. Lewis testified that he stepped only one foot into the home before he got scared and turned and ran away. He said he later heard that the defendant and Boyd had not taken anything from the home. He testified that he was five feet, nine inches tall and that he never had a gun during the burglary.

On cross-examination, Lewis denied telling anyone that he would not get into any trouble as long as he testified against the defendant. He said that both he and the defendant were wearing tank tops during the burglary and that the defendant wore a blue bandana.

The defendant's mother, Angelia Qualls, testified on the defendant's behalf that after the incident, she overheard Lewis tell someone on the telephone that he was not going to do any time for the crimes and that the defendant was going to do it. On cross-examination, she testified that when she asked the defendant to tell her about his involvement in the crimes, he told her that he had accompanied Lewis to the Spearmon home because Lewis had been "jumped on and robbed." The defendant told her that he had kicked in the door to the home, but denied having had a gun.

The nineteen-year-old defendant testified that the information he provided in his statement to the police was true. He said that on the day of the burglary, Lewis called him and asked if he would help him commit a crime. He agreed, and Lewis picked him up, drove him to his aunt's house, and parked his car. The two of them then walked with Boyd to the Spearmon home, where Boyd knocked on the door. The defendant stated that his cousin had told him beforehand what they were looking for and that, when he entered the home, he went directly into the room on the left and began searching through the drawers for "the item that [Lewis] told [him] would be there." When he was unable to find it, he fled with Lewis to Lewis' car, where they stashed their masks, caps, and gloves and then drove to Lewis' home.

The defendant estimated that the entire episode at the Spearmon home lasted only two minutes. He denied that he had a gun and said that, if Lewis had one, he was unaware of it. On cross-examination, he testified that Lewis asked him to help him "go hit a lick," which meant to go steal something. He said the items Lewis wanted him to help steal were guns and marijuana, and he and Lewis planned to equally split anything they found in the home. He stated that he was wearing a purple bandana and a t-shirt, not a tank top, during the burglary. He also insisted that Lewis was at least five feet, ten inches tall instead of the five feet, nine inches that he claimed. Finally, he acknowledged that, at six feet, four inches, he

was the tallest man in the group. He adamantly denied, however, that he had anything to do with holding a gun to the young victim's head.

Sharon Russell, a cousin to both the defendant and Lewis, testified as a rebuttal witness for the State that she had heard the defendant say that Lewis did not have the gun and that Lewis had walked right back out of the home after entering it.

Following deliberations, the jury convicted the defendant of the indicted offenses, and the trial court subsequently sentenced him to consecutive terms of three years at 30% for the aggravated burglary and six years at 100% for the firearm conviction. Thereafter, the defendant filed a timely appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to sustain his conviction for employing a firearm during the commission of a dangerous felony. Specifically, he argues that Kylan Spearmon's testimony about the gunman's height, which he characterizes as "questionable," was insufficient to corroborate Lewis' identification of him as the gunman. Among other things, he points to Spearmon's acknowledgment that he did not mention the gunman's height until questioned by the police and his own testimony that he was wearing a t-shirt, rather than a tank top, during the burglary. The defendant asserts that if Spearmon's unreliable testimony regarding the gunman's height is eliminated, the rest of the evidence supports a finding that it was Lewis, rather than himself, who was armed with a gun. The defendant additionally argues that the evidence is insufficient to sustain his conviction under a theory of criminal responsibility for the actions of Lewis because there was no proof, apart from Lewis' testimony, that he had any knowledge of the existence of the weapon. The State responds by arguing that the evidence is sufficient to sustain the defendant's firearm conviction under either theory of the case. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the

weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant first argues that there was insufficient corroboration of his accomplice's testimony identifying him as the gunman. In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964). Our supreme court has described this requirement as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is generally a determination for the jury. Bigbee, 885 S.W.2d at 803.

We conclude that the evidence, viewed in the light most favorable to the State, is more than sufficient to establish that the defendant was the man who employed a firearm during the commission of the aggravated burglary. In addition to Lewis, the jury heard from the victim who was unequivocal in his testimony that the gunman was much taller than he was. It was undisputed that the defendant is several inches taller than both the victim and his accomplice, and the jury was able to view these "height differentials" in the courtroom. In addition, the defendant's aunt testified that she overheard the defendant state that Lewis did not have a gun during the burglary. From all this evidence, the jury could have convicted the defendant of employing a firearm during the commission of a dangerous felony based on a finding that the defendant was the man who held the pistol to the victim's head during the aggravated burglary.

The evidence was also sufficient for the jury to convict the defendant under the alternate theory of his criminal responsibility for the actions of his accomplice. Tennessee Code Annotated section 39-17-1324 provides that it is an offense to employ a firearm during the commission of, or attempt to commit, a dangerous felony, and lists aggravated burglary as one of the qualifying dangerous felonies. Tenn. Code Ann. § 39-17-1324(b)(1)(2), (i)(1)(H) (2010). Under the theory of criminal responsibility for the actions of another, the jury could find the defendant responsible for Lewis' employment of a firearm during the commission of the aggravated burglary if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [he] solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid [Lewis] to commit the offense." Tenn. Code Ann. § 39-11-402(2).

No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). Moreover, when the defendant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, he is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

Here, the defendant acknowledged that he agreed to help Lewis "hit a lick," accompanied him to the victim's house, kicked in the door, entered, and searched through dresser drawers for guns and drugs that Lewis told him he would find there. He also said that he and Lewis planned to divide the proceeds of their criminal act. The jury could, thus, have

found the defendant guilty of the firearm offense, even if it believed that Lewis was the one with the gun, under the theory that the defendant was criminally responsible for his accomplice's actions during the course of the aggravated burglary. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction.

## II. Denial of Mistrial Based on Alleged Prosecutorial Misconduct

The defendant next contends that the trial court should have granted his request for a mistrial following the prosecutor's introduction of his defense counsel as employees of the public defender's office. The defendant argues that such a reference to the public defender's office created a reasonable inference that he was in jail, prejudiced the jury against him, and deprived him of a fair trial. The State disagrees, arguing that the trial court acted within its discretion in denying the request for a mistrial. We agree with the State.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

The record reflects that the prosecutor began his address to the venire members by introducing himself by name and with the identifying information that he was "with the district attorney's office," before following a similar procedure in his introduction of his fellow assistant district attorney and the two defense counsel who were "with the public defender's office." Defense counsel later objected and requested a mistrial, arguing that the identification of counsel as employees of the public defender's office was inherently prejudicial because it led to the reasonable inference that the defendant was unable to afford counsel and was in jail. The trial court denied the request, noting that the State should not have introduced defense counsel in that manner and admonishing the State not to do so in the future, but concluding that it "really [was not] a big deal." We find no abuse of discretion in the trial court's decision in this matter. It is clear that the prosecutor intended no disrespect or prejudice to either defense counsel or the defendant by the introductory

information he provided but was simply introducing defense counsel in the same fashion in which he had introduced himself and his colleague. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

### III.  Accomplice's Understanding of Plea Agreement

The defendant next contends that his due process and confrontation rights were violated by the State's eliciting of "improper lay opinion testimony regarding an irrelevant legal conclusion and ultimate issue for the trier of fact." Specifically, he asserts that Lewis' testimony about his understanding of how he could be charged, under a theory of criminal responsibility, with employing a firearm during the commission of a dangerous felony amounted to an improperly admitted legal opinion by the witness, which violated the defendant's rights to a fair and impartial trial and to confront and cross-examine the witnesses against him. The State disagrees, arguing, *inter alia*, that Lewis' testimony about his understanding of the plea was merely part of the State's required full disclosure of the terms of the plea agreement. We agree with the State.

Lewis began his testimony by acknowledging that he, like the defendant, had been charged with aggravated burglary and employing a firearm during the commission of, or attempt to commit, a dangerous felony. He further acknowledged that the State had agreed to dismiss the firearm count of the indictment in exchange for his truthful testimony at the defendant's trial. He then related what occurred on the day of the burglary, which included his account of the defendant's having been the one with the weapon. After he was finished, the prosecutor began to ask about his understanding of how he could be charged with employing a firearm, even if he was not the one with the weapon, under the theory that he was criminally responsible for the actions of his partner in crime. Defense counsel objected, arguing that Lewis' understanding of the law was irrelevant and potentially prejudicial because it allowed the State to "make a legal argument through . . . a witness."

The trial court overruled the objection. It did, however, issue a curative instruction to the jury to the effect that it would instruct the jurors on the law and that the question was being allowed for the purpose of allowing the witness to testify as to "what he understood he could be charged with or could not be charged with."

We find no error in the trial court's ruling. As the State points out, our supreme court has adopted the following safeguards that should be followed before the admission of testimony that has been procured through a plea bargain agreement:

(1) full disclosure of the terms of the agreements struck with the witnesses;

(2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and

(3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the State to testify against the defendant.

State v. Bolden, 979 S.W.2d 587, 590 (Tenn. 1998) (citations omitted).

"[T]he safeguards attendant to allowing testimony induced by a plea agreement – full disclosure of the terms of the plea agreement and cross-examination into the witness'[s] motives and bias – place the responsibility of weighing the testimony and credibility of the witness upon the jury." Id. at 591 (citation omitted). We agree with the State that Lewis' testimony about his understanding of how and why he could be charged with employing a firearm during the commission or attempt to commit a dangerous felony, and his realization that he was "getting a pretty good break" by the State's dismissing the firearm charge, was necessary for the jury to have the complete picture of the terms of his plea agreement in order to assess his credibility and potential bias. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

### IV.  Alternate Theories of Defendant's Guilt

The defendant next contends that his due process rights to a fair and impartial trial "were violated when Rodnicholas Lewis gave false testimony" at his trial. Although not entirely clear, the defendant appears to argue that Lewis was either lying about which man employed the firearm, in which case the defendant was unfairly convicted on the basis of false testimony, or Lewis was telling the truth, in which case the State was not entitled to a jury instruction on the theory of criminal responsibility. The defendant also appears to argue that the State's reliance on alternate theories of the defendant's guilt violates the doctrine of judicial estoppel. The State responds by arguing that the doctrine of judicial estoppel is inapplicable to the case and that the law is clear that the State may pursue alternate theories of a defendant's guilt if the evidence supports both theories. We agree with the State.

The doctrine of judicial estoppel prevents a party from taking a position in a judicial proceeding that is contrary to an oath or sworn statement made in a previous judicial proceeding. Our supreme court explained:

[W]e take this opportunity to clarify that the doctrine of *judicial* estoppel is applicable only when a party has attempted to contradict by oath a sworn

statement previously made. See Allen v. Neal, 217 Tenn. 181, 396 S.W.2d 344, 346 (1965) (noting that "[j]udicial estoppels arise from sworn statements made in the course of judicial proceedings, generally in a former litigation, and are based on public policy upholding the sanctity of an oath and not on prejudice to adverse party by reason thereof, as in the case of equitable estoppel"). In those instances where no oath is involved but the party is attempting to gain an unfair advantage by maintaining inconsistent legal positions, the doctrine of *equitable* estoppel should be applied.

Cracker Barrel Old Country Store, Inc. v. Epperson, 284 S.W.3d 303, 315 (Tenn. 2009) (emphasis in original). The policy behind the doctrine is to "suppress fraud and prohibit the deliberate shifting of position to suit the exigencies of each particular case that may arise concerning the subject matter in controversy." Decatur County Bank v. Duck, 969 S.W.2d 393, 397 (Tenn. Ct. App. 1997) (citing Carter v. E.T. & W.N.C. Transp. Co., 243 S.W.2d 505, 509 (Tenn. Ct. App. 1949)).

The State's reliance on alternate theories of the defendant's guilt implicates neither the doctrine of judicial estoppel nor the doctrine of equitable estoppel. The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:

"(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; [and] (3) Knowledge, actual or constructive, of the real facts."

Cracker Barrel Old Country, 284 S.W.3d at 315-16 (quoting Werne v. Sanderson, 954 S.W.2d 742, 745 (Tenn. Ct. App. 1997)).

If the evidence warrants it, the State may legitimately pursue at trial the alternate theories that a defendant is guilty of an offense either because he directly committed the crime, or because he aided another to commit the offense. See State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999). Here, the prosecutor merely argued that, even if Lewis was lying and it was Lewis, rather than the defendant, who had the gun, the jury could still convict the defendant of the firearm count of the indictment under the theory that he was criminally responsible for the actions of Lewis during the commission of the burglary. We note that the prosecutor's argument was made, in part, in response to defense counsel's argument that the State had entered into a plea bargain with the wrong, more culpable defendant. We disagree

-11-

with the defendant's contention that the State's reliance on the "contrary position" of the defendant's guilt under the theory of criminal responsibility "remove[d] the jury's duty to determine the credibility of witnesses, relieve[d] the [S]tate of [its] burden of proof, [or] create[d] a directed verdict of guilt." To the contrary, it remained within the jury's province to believe some, all, or none of the testimony of each witness, including Lewis. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## V. Denial of Request For Special Jury Instructions

The defendant contends that the trial court violated his due process rights to a fair trial by refusing to instruct the jury on the definitions of "possession" and "constructive possession"of a firearm. The defendant argues that he was entitled to such instructions both because they were elements of the offense of employing a firearm during the commission of a dangerous felony and because they were lesser-included offenses to that indicted offense. The State argues that the trial court properly refused to instruct the jury on the definition of possession as an element of the offense. The State further argues that the defendant has waived the issue of whether the trial court erred by not instructing the jury on possession of a firearm as a lesser-included offense by his failure to request the instruction at trial. We, once again, agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

The record reflects that the defendant requested that the trial court instruct the jury on "possession" and "constructive possession" as an element of the offense of employing a firearm during the commission of a dangerous felony, arguing that it was necessary for a person to be in possession of an object in order to employ it. The trial court, however, denied the request, finding it inapplicable and unnecessary:

Well, the employment, as I understand the statute, is a different charge or different crime than possession, and the defendant was not indicted for possession of a firearm. He was indicted for employment of a firearm during

-12-

the commission of aggravated burglary.

So the Court doesn't anticipate charging and there's no need to charge, as far as I know, possession may be actual or constructive, and so forth.

The court instructed the jury as follows for the offense of employing a firearm during the commission of, or attempt to commit, a dangerous felony:

For you to find the defendant guilty of the offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

1. That the defendant employed a firearm; and

2. That the employment was during the commission of or attempt to commit aggravated burglary ; and

3. That the defendant acted either intentionally, knowingly, or recklessly.

. . . .

Employ means to make use of.

Firearm means any weapon designed, made, or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use.

Aggravated burglary is a dangerous felony.

We agree with the State that the trial court's charge, which followed the pattern jury instruction, contained a complete and accurate statement of the law and that the trial court did not err in denying the defendant's special jury instruction request. We further agree that the defendant has waived consideration of whether the trial court should have instructed the jury on possession of a firearm as a lesser-included offense by not specifically making that request at trial.

Defense counsel submitted a written pretrial "Motion for Court to Charge all Lesser Included Offenses" and, at the conclusion of the trial, a written motion that the trial court

-13-

instruct the jury on "Possession of/Employment of a Firearm During the Commission, Attempt, or Flight from Commission of a Dangerous Felony" with definitions of possession and constructive possession. He did not, however, specifically request that the trial court instruct the jury on possession of a firearm with the intent to go armed as a lesser-included offense of employing a firearm. Moreover, when asked by the trial court whether he knew of any lesser-included offenses to employing a firearm during the commission of or attempt to commit a dangerous felony, he answered that he did not. We conclude, therefore, that the defendant has waived the issue on appeal, see Tenn. Code Ann. § 40-18-110(b), and that plain error review is unnecessary in this case. See Tenn. R. App. P. 36(b).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE